```
 1                    UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF TEXAS
 2                          AUSTIN DIVISION

 3   YETI COOLERS, LLC          ) Docket No. A 17-CA-1145 RP
                                )
 4   vs.                        ) Austin, Texas
                                )
 5   WAL-MART STORES, INC.      ) April 24, 2018

 6
                        TRANSCRIPT OF STATUS CONFERENCE
 7              BEFORE THE HONORABLE ANDREW W. AUSTIN

 8

 9   APPEARANCES:

10   For the Plaintiff:         Mr. Joseph J. Berghammer
                                Mr. Marc S. Cooperman
11                              Banner & Witcoff
                                Ten South Wacker Drive, Suite 3000
12                              Chicago, Illinois 60606

13

14   For the Defendant:         Ms. Tara D. Elliott
                                Wilmer, Cutler, Pickering,
15                              Hale & Dorr
                                1875 Pennsylvania Avenue NW
16                              Washington, D.C. 20006

17                              Mr. Sherrard Lee Hayes
                                Weisbart, Springer, Hayes
18                              212 Lavaca Street, Suite 200
                                Austin, Texas 78701
19

20   Transcriber:               Ms. Lily Iva Reznik, CRR, RMR
                                501 West 5th Street, Suite 4153
21                              Austin, Texas 78701
                                (512)391-8792
22

23

24

25   Proceedings reported by electrical digital sound recording,
     transcript produced by computer.
```

1          (Proceedings commence at 2:38 p.m.)

2          THE CLERK:  The Court is now in session for a status

3    conference:

4          17-CV-1145, <u>Yeti Coolers, LLC vs. Wal-Mart Stores, Inc.</u>

5          THE COURT:  Counsel, if you want to introduce yourself

6    for the record.

7          MR. BERGHAMMER:  Sure, your Honor.

8          Joe Berghammer on behalf of Yeti.

9          MR. COOPERMAN:  Good afternoon, your Honor.

10         Mark Cooperman for Yeti.

11         MR. BARKSDALE:  Good afternoon, your Honor.

12         Bryan Barksdale, general counsel for Yeti.

13         MR. HAYES:  Your Honor, Butch Hayes for Wal-Mart, and

14   I'd like to introduce you to my colleague, Tara Elliot, who can

15   introduce herself.

16         MS. ELLIOTT:  Good afternoon, your Honor.

17         Tara Elliot on behalf of Wal-Mart.

18         THE COURT:  Thank you.

19         And just reminder, since we get our record from an

20   audio recording, if you can, make sure that your voice is getting

21   picked up by the microphone or else you're inaudible or on the --

22   any transcript.

23         All right.  So we're here on the motion for protective

24   order to stay discovery that Wal-Mart's filed.  I read

25   everything.  I actually read all the motions to dismiss and the

1   attachments, so I would like to cut to the chase here today.  And

2   as I understand it, the reason why Wal-Mart is seeking to stay

3   discovery at this point relates to the fact that there's a

4   settlement agreement in the case from the prior litigation that

5   Wal-Mart believes effectively dooms the claims that Yeti's trying

6   to make.  Yeti disagrees with that.  And there's a lot going back

7   and forth about what exactly this case is alleging, so I want to

8   try to get clarity on that, as well.

9           Before we get into anything further, though, this

10  settlement agreement was confidential.  There's been a lot of

11  sealed stuff filed.  We hate that, but we're also busy over here

12  right now that we're not doing what we normally do, which would

13  be to kick orders back at you when you ask to file stuff under

14  seal that says, cut it out.  And that takes more work than just

15  letting you file it, so we've just been letting you file it.

16          But the relevant clause at issue here in the settlement

17  agreement, C.3, I think it is, or C.2, whatever that subparagraph

18  is, is there any objection to the Court discussing that clause

19  here in court today openly?

20          MR. BERGHAMMER:  Your Honor, from Yeti's side, no

21  objection, but I think we need to discuss all of Section C.  So

22  C.1, 2, 3 and 4.

23          MS. ELLIOTT:  Your Honor, Wal-Mart does not object to

24  the discussion of C -- provisions of C on the record.

25          THE COURT:  Okay.  All right.

1          So as I understand it, then, let me focus what I think

2    is the point of contest here is that Wal-Mart appears to be

3    taking the position that that paragraph in C.2 excludes from many

4    of the obligations that it has to keep counterfeit or other

5    offend -- infringing goods off of the web page.  It exempts from

6    that, using the language that's there, commercial activity on

7    e-commerce platforms Wal-Mart does not control, including, but

8    not limited to, the Wal-Mart marketplace.

9          Now, Wal-Mart's position that everything they're being

10   accused of in the current lawsuit occurred there and falls within

11   the scope of that.  Yeti hasn't taken a specific position on

12   that, except to say, it seems I'm not having -- you know, I don't

13   find anywhere where you discuss that language and why that

14   language doesn't apply, Mr. Berghammer.  What I've seen is

15   statements that, well, we think Wal-Mart controls it, its website

16   and, therefore, that this doesn't apply.  So.

17          MR. BERGHAMMER:  Sure.

18          THE COURT:  And I'm sure there's some elaboration on

19   that, as well.

20          But before you get into any argument, is that an

21   accurate statement of what -- well, let me ask this question, Mr.

22   Berghammer, of you.  If, in fact, the clause that Wal-Mart's

23   relying on is found to apply to anything sold on the Wal-Mart web

24   page that's not sold by them, but by a third party, are there any

25   claims in this lawsuit left?

1          MR. BERGHAMMER:  Absolutely.

2          THE COURT:  Okay.

3          MR. BERGHAMMER:  And --

4          THE COURT:  Well, let's address that, then, if you

5     would.

6          MR. BERGHAMMER:  Sure.  Where do you want me, your

7     Honor?

8          THE COURT:  Wherever you'd like.

9          MR. BERGHAMMER:  I think I'm going to go over there

10    because I can -- I don't have to crouch.

11         THE COURT:  Okay.

12         MR. BERGHAMMER:  So -- and we disagree with Wal-Mart's

13    interpretation.  But even if Wal-Mart's interpretation of --

14         THE COURT:  And I don't think I'm here to decide that

15    obviously.  That's the motion to dismiss.  That's been Judge

16    Pitman, not me.

17         MR. BERGHAMMER:  Yep.

18         THE COURT:  But I'm just trying to frame the issue and

19    get straight to where we're fighting so that --

20         MR. BERGHAMMER:  Uh-huh.

21         THE COURT:  -- I know how to answer this particular

22    motion.  So.

23         MR. BERGHAMMER:  And, your Honor, I'm not sure that

24    issue is before Judge Pitman, that Wal-Mart's motion to dismiss

25    was actually based on res judicata, and was based on no damage,

1  and was based on Yeti not having enough allegations in its

2  complaint.  So I actually don't know that's in front of Judge

3  Pitman, but I also want to go to the crux of your issue.

4          If Wal-Mart's interpretation is correct, then it's

5  possible that Yeti's claims for breach of contract could be out

6  of the case.  All of Yeti's claims for infringements of its IP

7  remain.  That that provision -- this is why we put the Elmo on.

8  So that provision, your Honor, is C.3.

9          THE COURT:  Right.

10          MR. BERGHAMMER:  And it states -- I gotta get there.

11 Oh, no.  It's C.2.

12          THE COURT:  Yep.

13          MR. BERGHAMMER:  So in C.2, it states that -- I'm

14 sorry, your Honor.  When it states, is not within the control of

15 Wal-Mart and any of the above-prohibited activities involving the

16 accused products on or through such platforms do not constitute a

17 violation of this provision by Wal-Mart.

18          THE COURT:  All right.

19          But it does say that -- gives one specific item that is

20 within the scope of the clause, and that is commercial activity

21 on e-commerce platforms Wal-Mart does not control, including the

22 Wal-Mart marketplace.  And I take it that what Wal-Mart seems to

23 be saying is that everything that's at issue in the lawsuit here,

24 all of these products were products that are on the Wal-Mart

25 marketplace that aren't Wal-Mart sales but some third party.

1          MR. BERGHAMMER:  So, your Honor, we very much disagree

2     with Wal-Mart there, and that's why you have to look at Section

3     C.4.

4          THE COURT:  Okay.

5          MR. BERGHAMMER:  And I will just let you read that,

6     your Honor.

7          THE COURT:  Yeah.  I'm familiar with it.

8          MR. BERGHAMMER:  Okay.  So there's two websites at

9     issue here.  One of them is C.2, which is

10    marketplace.walmart.com, and the other is walmart.com.  Yeti

11    hasn't accused Wal-Mart of doing anything wrong on

12    marketplace.walmart.com.  Yeti has never done anything that would

13    affect C.2.  It's our understanding that marketplace.walmart.com

14    is Wal-Mart's internal web dealings with its suppliers.

15         So if a supplier wants to sell products through

16    Wal-Mart that it interacts with Wal-Mart through

17    marketplace.walmart.com, then -- and that's all internal and

18    we're not -- and I could see how there could be infringements

19    within the internal marketplace what someone could be confused,

20    Wal-Mart could be confused, hey, you, Mr. Seller, is this a Yeti

21    product, is this not a Yeti product, that would be a type of

22    infringement.

23         What we were concerned about is www.walmart.com.

24    That's their external website.  That's the website that faces the

25    public.

1          THE COURT:  But, I mean -- I mean, I see your argument,

2    I mean, but when you read C.2, it's talking about e-commerce

3    platforms like -- that it doesn't control, and it lists the

4    Wal-Mart marketplace as one of those.  So either Wal-Mart was

5    massively mistaken about what it does or doesn't control or they

6    were intending to say that -- I mean, let me go back a step.

7          My understanding from what's been filed is Wal-Mart's

8    web page, much like Amazon's web page, includes things that it

9    sells directly and fulfills, and that it also has third-party

10   sellers that it allows to use the marketplace, and those are

11   fulfilled by third-party users.  eBay is one of those.  That's

12   listed in the example, as well, in the C.2, but it listed

13   Wal-Mart's marketplace as something it didn't control.

14         So I'm kind of baffled how you can read that to mean

15   that only if they were selling something to the public on a

16   website called marketplace.walmart.com would C.2 carve that out.

17         MR. BERGHAMMER:  So.

18         THE COURT:  But I mean --

19         MR. BERGHAMMER:  Right.  I'm trying to think of how

20   best to phrase this, your Honor.  I lost my train of thought.  It

21   will come.

22         Wal-Mart has complete control of www.walmart.com.

23   Hundred percent control.  All the documents reflect that.  All of

24   Wal-Mart's statements reflect that.  And walmart.com is different

25   than Alibaba or others.  It's an invitation-only website.  You

 1   have to get invited to go to walmart.com.  And Wal-Mart agrees

 2   that it can take down anything that's on walmart.com.  It has

 3   complete control and Wal-Mart makes 15 percent of the sales of

 4   products on walmart.com.

 5           And Wal-Mart goes on to say that it controls

 6   www.walmart.com.  So while this agreement says Wal-Mart doesn't

 7   control marketplace.walmart.com, it says that Wal-Mart does

 8   control www.walmart.com, which is what we're accusing of

 9   infringement.

10           So, your Honor, there may be something in the aiding

11   and abetting language that C.2 talks specifically about aiding

12   and abetting, and it may be that an infringement that is limited

13   to only marketplace.walmart.com, but never gets to walmart.com,

14   that if Wal-Mart's reading's correct, Yeti couldn't sue Wal-Mart

15   for aiding and abetting based on that activity at

16   marketplace.walmart.com.

17           But, again, I want to go back, your Honor.  They're two

18   very different things:  One's internal, one's external.  Yeti's

19   not suing on the internal site.  Yeti's only suing on the

20   external site.  And beyond all that, your Honor, this is not a

21   covenant not to sue.  Yeti is not saying in C.2, Yeti covenants

22   not to sue Wal-Mart.  Yeti is not saying in C.2, Wal-Mart can

23   sell counterfeit products on www.walmart.com.  That's --

24   Wal-Mart's interpretation is through this agreement, Yeti said,

25   Wal-Mart, sell as many counterfeit as you want on your website.

1          THE COURT:  I think it's a little less than that.  I

2    think what they're saying is, they didn't want to get sued for

3    that, and that if you wanted to sue third-party sellers on --

4    that were selling counterfeit product on their website, that you

5    needed to go after those sellers directly.  I think that's what

6    Wal-Mart's position is.

7          MR. BERGHAMMER:  So, your Honor, even -- so okay.  We

8    disagree that the agreement is so limiting; but even if it is,

9    all that the agreement states is that whatever happens up here

10   with marketplace.walmart.com does not constitute a violation of

11   this provision by Wal-Mart.  And so, that's C.2.  It does not

12   constitute a violation of this provision, C.2 by Wal-Mart.  Has

13   nothing to do with C.4, has nothing to do with C.1, and, on top

14   of that, has nothing to do with Yeti's overall intellectual

15   property rights.

16         THE COURT:  Can you pull that down a little bit so I

17   can read C.1?  Thank you.

18         MR. BERGHAMMER:  Sorry, your Honor.

19         THE COURT:  Okay.

20         MR. BERGHAMMER:  So Wal-Mart -- we think Wal-Mart has

21   breached the agreement.  We think it breached C.1 and C.4.  We

22   don't think it breached C.2.  Obviously open to -- you know, we

23   still have to do analysis, et cetera.  But if Wal-Mart's correct

24   that C.2 doesn't apply, Yeti still has its rights under C.1 and

25   C.4.

1            THE COURT:  To make sure I understand and make it as

2    explicit, so what you've just said is that C.2, where this

3    language that we've been talking about exists, prohibits Wal-Mart

4    from -- or their -- it's an agreement by Wal-Mart not to aid,

5    abet, assist other persons or companies in manufacturing, using,

6    marketing, advertising, promoting, offering to sell, selling,

7    importing, et cetera, any of the accused product, and you're not

8    saying they breached that provision.

9            What you're saying in this new lawsuit is that Wal-Mart

10   breached the agreement that it will not market, offer to sell,

11   sell, use, import, purchase any of the accused products.

12           MR. BERGHAMMER:  So --

13           THE COURT:  And also, that C.4 that they didn't do the

14   deletions that they were supposed to do.  And that even if 2 is

15   applied to publicly available sales, that you're not worried

16   about that because that's limited to -- the exclusion to

17   eliminate all doubts is limited to C -- to the agreements of C.2.

18           MR. BERGHAMMER:  So, your Honor, I don't want to, a

19   hundred percent, say that we don't have an action under C.2.

20           THE COURT:  Well, I don't know.  It's time to take a

21   position sometimes and I'm asking for a position.

22           MR. BERGHAMMER:  Okay.  We have -- so I would say we

23   have an action -- give me just a second, your Honor.  We

24   definitely have an action under C.4 and under C.1.  I just want

25   to make sure I've got my thoughts correct in my head, your Honor.

1 And what I'd say, your Honor, is regarding Wal-Mart's activity on

2 marketplace.walmart.com, to the extent Wal-Mart does not have

3 control, we do not have an action under C.2.

4          THE COURT:  Okay.

5          MR. BERGHAMMER:  But, again, your Honor, I want to pull

6 back for the purpose of this motion to stay.  All of Yeti's IP

7 rights come into play.  Again, this isn't a --

8          THE COURT:  Well, all right.  Let's move on from

9 this --

10          MR. BERGHAMMER:  Okay.  Thank you, your Honor.

11          THE COURT:  -- issue and I'll give -- obviously

12 Wal-Mart's going to have something to say about that.

13          MR. BERGHAMMER:  Sure.  Thank you, your Honor.

14          THE COURT:  But the other big issue here that seems to

15 be a little bit of ships passing in the night is, can you state

16 emphatically, clearly that the only thing that you're suing for

17 -- that Yeti is suing for in this case are actions that took

18 place -- I think the phrase that y'all had used is after the

19 selloff period.

20          MR. BERGHAMMER:  Uh-huh.

21          THE COURT:  And you're not suing for any behavior that

22 occurred before the selloff.

23          MR. BERGHAMMER:  Yes, with a coda.  So a hundred

24 percent yes, what we are suing on is activity after the selloff

25 period.  One of the remedies we are seeking is our damages based

1    on that, and that may include rescission of the agreement.  That

2    may include restitution damages from the agreement, which may

3    include the profits from the previous sales.

4                THE COURT:  But leaving aside those issues.

5                MR. BERGHAMMER:  Uh-huh.

6                THE COURT:  The actionable facts, the infringing

7    activities that you're suing for are those that occurred after

8    the selloff.

9                MR. BERGHAMMER:  Selloff period.

10               THE COURT:  Selloff period.

11               MR. BERGHAMMER:  A hundred percent, yes.

12               THE COURT:  And you're not seeking to hold Wal-Mart

13   liable for actions it may have taken before that time.

14               MR. BERGHAMMER:  Correct.

15               THE COURT:  All right.

16               MR. BERGHAMMER:  Okay.

17               THE COURT:  Thank you.

18               MR. BERGHAMMER:  Thank you, your Honor.

19               THE COURT:  Anything else you want to add, I guess, at

20   this time on that point?  It's not your motion.  I'm going to let

21   Ms. Elliot start where she wanted to probably.  But anything else

22   on those issues?

23               MR. BERGHAMMER:  Just thinking if there's anything --

24               THE COURT:  I'll give you an opportunity to obviously

25   respond on the motion.

1          MR. BERGHAMMER:  Not for now, your Honor.  When I look

2    at my notes, I may have others.

3          THE COURT:  All right.

4          MR. BERGHAMMER:  Thank you, your Honor.

5          THE COURT:  Ms. Elliot.

6          MS. ELLIOTT:  Thank you, your Honor.

7          Your Honor has obviously gone straight to the heart of

8    matters.  We appreciate the Court's willingness to hear oral

9    argument on this motion.  And we also appreciate that the Court

10   has read the papers, both on the motion for the protective order

11   as well as the motion to dismiss.

12          Wal-Mart's obviously seeking a protective order for all

13   discovery in this case pending the resolution of that motion to

14   dismiss, and we understand it's pending before Judge Pitman.  And

15   I think it's important for us to note that Wal-Mart does not do

16   this lightly.  Wal-Mart does so knowing full well this court's

17   precedent, knowing full well that it's --

18          THE COURT:  Can I -- I'll put you at ease.  I get it.

19          MS. ELLIOTT:  Okay.

20          THE COURT:  This is a slightly different situation.

21   When there's been a prior suit and then, there's a new suit.

22          MS. ELLIOTT:  Yes.

23          THE COURT:  It's not the same circumstances.  So -- and

24   whether it's sufficient enough to get past that, I don't know,

25   but you don't need to apologize, I guess.

         MS. ELLIOTT:  Oh, I appreciate that, your Honor.

         At the end of the day, we're here having resolved the
parties' disputes between Yeti and Wal-Mart over a year ago.  And
Wal-Mart, instead of battling over designs that we respectfully
submit aren't innovative and aren't inventive, Wal-Mart chose an
amicable resolution to alter that design in a way that Yeti
didn't object to and didn't find problematic, and that
understanding was memorialized in the agreement that we are all
focused on.

         In that settlement, the parties also unequivocally
agreed to some terms that are at the heart of the matter, and we
discussed some of them.  But I think just to orient us to what
those important terms were, your Honor, if I may just enumerate
what we think are pivotal provisions.

         First, Yeti agreed not to sue Wal-Mart on issues it
raised or could have raised in that suit.  A lot of what my
colleague, Mr. Berghammer, just talked about are precisely within
the scope of the lawsuit it filed in 2016, and that was resolved
by settlement and that was dismissed with prejudice in June of
2017.

         THE COURT:  Well, he does say, though, and I -- he
said, unequivocally, that facts that would be the liability facts
all postdate the selloff period.  So doesn't that make them if
they're viable.

         MS. ELLIOTT:  Uh-huh.

1        THE COURT:  If they survive a dismissal motion,

2  wouldn't those be new claims?

3        MS. ELLIOTT:  So it's interesting that's one of several

4  things we heard today that is not in Yeti's complaint.  Because

5  that position is nowhere found in the complaint, and it is quite

6  equivocal in their papers, both in their opposition and to the

7  motion to dismiss their opposition to the pending motion, and in

8  their discovery responses.  And despite Wal-Mart's best efforts

9  to pin Yeti down, in our own course of trying to resolve this,

10  they refuse to make the concession they just made a few moments

11  ago.  We're glad to hear it, but we're still left with the

12  complaint and two rounds of discovery, 95 document requests and

13  16 interrogatories that in no way honor the concession that was

14  just made and more so, is aligned with the breadth of the

15  complaint.

16        That's why we're here and seeking the Court's help

17  because the positions that are being taken now are not the

18  positions that we're forced to reckon with as a defendant in this

19  action, and we think that is abusive, and that's precisely the

20  kind of matter that warrants a stay and a protective order.

21        The second provision that we think is important to

22  focus on in that agreement is that Wal-Mart could sell its

23  existing inventory until October 17th.  It sounds like there's no

24  dispute over that, but it's an important point that I suspect

25  we'll come back to.  But most importantly is that provision we've

been all been focused on.  It's this e-commerce provision that we've probably all looked at numerous times at this point, but it's worth giving some focus now.  Because it uses -- it's prefaced by those five words that we as lawyers all know, it invoked when the parties purposely want to highlight this is important and we want to preempt the misinterpretation, we want to literally avoid any doubt.  Those words were chosen.  Yeti is well represented by experienced counsel.  We went over this and went back and forth over this agreement for months, and Yeti's CEO signed it.  These were terms they unequivocally agreed to.

We are finding ourselves contending with positions in their opposition briefs, positions stated just now about whether or not Wal-Mart controls when, in fact, it's been wholly resolved by both sides.  It's not just Wal-Mart's position, it's now Wal-Mart's and Yeti's position because both parties signed off on there for the avoidance of doubt.

Good cause to stay discovery here, we think, is well established, your Honor.  It's established because -- not because Wal-Mart has a subjective, good-faith belief in its meritorious -- this motion to dismiss.  We do have that.  But that's not the reason why I think good cause is shown here.  I think it's shown and established through Yeti's admissions and Yeti's omissions.

And your Honor started the hearing today pointing out one of the biggest omissions, which is Yeti never addressed this

1   language in any of their papers.  Not once did they address this

2   language, and it's the obvious elephant in the room and perhaps

3   probably obvious why.

4          But that's not the only thing Yeti doesn't address.

5   Yeti doesn't address the Federal Circuit case law, the Ninth

6   Circuit case law, the Middle District of Pennsylvania and Alabama

7   who followed those provisions, and those cases universally say,

8   consistent with this language in the agreement, that third-party

9   sellers -- or let me rephrase that.  E-commerce platform

10  companies aren't responsible for the activities, the torts, if

11  you will, of third-party sellers.

12         And Amazon has frequently battled this issue and has

13  prevailed all the way up to the Ninth Circuit and the Federal

14  Circuit.  One was in the context of what technically is a sale.

15  It analyzed the UCC language.  Another case analyzed intellectual

16  property claims.  This is not brand-new and it's not surprising

17  that the language of our agreement that both sides agreed to for

18  the avoidance of doubt follows that case law on that precedent.

19  Yeti omits that and doesn't address that, as well.

20         Yeti also, to a point your Honor, I think, observed

21  already, never identifies any products that Wal-Mart is selling

22  or manufacturing that would give rise to a plausible claim for

23  relief.  Every last example we've seen that's in the complaint

24  and then, all examples that have come after the complaint which

25  aren't appropriate on the motion to dismiss, in any event, have

1   been sales by third parties.  So parties who are selling the

2   product on walmart.com.

3          I'll say one more thing, and then, i want to get to a

4   couple of the issues that I heard Mr. Berghammer mention and, I

5   think, warrants some rebuttal.  Yeti never identifies any harm

6   associated with not receiving the notice information in November.

7   Why do we think that's important?  Because when he -- I think

8   when the Court does get an opportunity to go through the merits

9   of the motion to dismiss, I think the Court will find that that's

10  what's left.

11         If there is any discernible claim -- and I'm not

12  acknowledging that it's a well-pled claim.  But if there's any

13  claim that you can carve out once you put past what is foreclosed

14  by the previous settlement and lawsuit, what's foreclosed by this

15  agreement C.2 and the case law that says third parties selling on

16  e-commerce platforms are not the responsibility of the e-commerce

17  platform provider, then all you have left is a breach of contract

18  because in Yeti's allegation, Wal-Mart failed to provide

19  information in a timely manner.

20         Wal-Mart does not concede that, but there are issues

21  that one could conceivably argue around that.  That claim still

22  fails because there's absolutely no damages that they've

23  articulated.  And Texas state case law and federal case law is

24  observed, that's a requirement.  It's a required element of a

25  breach claim that there actually be some damages.  No -- no

1    recitation whatsoever.

2          And it can't be the same alleged damages as IP

3    infringement claims because if we're right -- and I'm not saying

4    that we'll win on that, but if we're right, those go away.

5    They've been foreclosed in the previous case.

6          So those are the omissions that I think are pretty

7    stark:  No addressing C.2 in the papers before today, no

8    addressing any Wal-Mart products sold.  We've stopped selling

9    Ozark Trail products, which was at issue in the previous case.

10   Doesn't address the federal case law about third-party platforms

11   and doesn't identify any harm.  But it's not just the omissions.

12   It's actually what they admitted that we think provides the good

13   cause here for a protective order.

14         Yeti has admitted both in its papers and to Judge

15   Pitman now in a scheduling conference that this is now a

16   counterfeit case.  So we've gone from the 142-paragraph complaint

17   in this case, 16 claims, and they're positioning this case as a

18   counterfeit case.  Your Honor, we respectfully submit you can't

19   see that case looking at the complaint, but we'll take that as it

20   is that they've now shifted.

21         Yeti also admits in its second set of discovery is

22   directed to the post-October 2017 activity, which your Honor was

23   able to get a position on Yeti that that's now what they're

24   focused on.  Again, divorce from the complaint, divorce from what

25   Wal-Mart would have otherwise been obligated to do by way of work

1  with witnesses and documents in response to 95 document requests

2  and 16 interrogatories but for us getting to the point where we

3  now know they're only accusing post-October 2017.

4          But what else does Yeti admit?  In its opposition to

5  the motion for protective order, on page 8, it admits that it's

6  seeking discovery to help identify claims.  Claims that it might

7  be possible.  The problem with that, your Honor, is the Supreme

8  Court has said on numerous occasions, you can't do that.  Iqbal

9  and Twombly say pretty clearly that you actually have to state a

10 plausible pleading in the complaint.  You can't use the device of

11 discovery to actually identify a claim.

12          And that's prejudicial and burdensome and oppressive to

13 the defendant, who has to answer a sprawling 16-count complaint

14 and the breadth of discovery Wal-Mart has received when, in fact,

15 they have effectively admitted in their papers they need the

16 discovery to come up with the claims.

17          Last point I'll make before I turn to some of the

18 points that we heard for the first time today is that Yeti does

19 admit -- and this is on page 7 of their opposition to the motion

20 to dismiss -- that it filed this case in part out of frustration.

21 And, your Honor, I actually understand frustration.  Not getting

22 information when you want to get information.  Not getting

23 information in the depth and detail you want to get information.

24 That does evoke frustration.

25          And I wish to Mr. Berghammer and I could have worked

1  that out before a suit was filed and we invoked the scarce

2  resources of this court and our clients are paying a lot of

3  lawyers money because frustration is not a basis to file a

4  complaint.  It's not a basis to file a complaint.

5          I want to address quickly, your Honor, if I may,

6  something that was an interesting fact that I don't think

7  Wal-Mart knows, which it has this internal and external site and

8  somehow, there's, you know, products sold on one and it

9  differentiates from another.  That's news to me.  I think our

10  client will find that to be news.  More importantly, and not to

11  be sarcastic about it, it's not in the complaint.  Those are not

12  facts that have been alleged or even discernible.  They don't get

13  Yeti out of what it unequivocally agreed to for the avoidance of

14  doubt.

15          I struggle, your Honor, to understand how this language

16  can be excerpted from a technical matter.  Just from a computer

17  science way of reading URLs.  I don't understand the explanation

18  that was given.  Walmart.com, as any website that you could go

19  to, has several folders which you can go through will give you a

20  different URL.  But the base site is walmart.com, and that is

21  precisely what the parties agreed to would not be in Wal-Mart's

22  control as it relates to commercial activity.  And the words that

23  were used is for the avoidance of doubt commercial activity on

24  e-commerce platforms that Wal-Mart does not control, including,

25  but not limited to.  Including but not limited to.

1          So even the notion that walmart.com and

2   marketplace.walmart.com might be different, which, respectfully,

3   it's not factually accurate, they were examples.  eBay was an

4   example in here.  We're just struggling to understand the logic

5   that somehow, there's some exception to this clear exception that

6   both sides agreed to.  It is not a Wal-Mart interpretation.  It

7   is a Wal-Mart-Yeti agreement.

8          There was one other point, your Honor, that I wanted

9   to --

10          THE COURT:  If you could.

11          MS. ELLIOTT:  Yes.

12          THE COURT:  And this might be where you're headed.

13          MS. ELLIOTT:  Okay.

14          THE COURT:  Mr. Berghammer pointed out that the

15   language of C.2 refers to this provision.  So for the avoidance

16   of doubt.

17          MS. ELLIOTT:  Uh-huh.

18          THE COURT:  I'm trying to find that language now.  It

19   might be in a different paragraph.  Oh, I'm sorry, it's that

20   sentence.  The end of that sentence, it says --

21          MS. ELLIOTT:  Uh-huh.

22          THE COURT:  -- none of that activity would constitute a

23   violation of this provision.  And their view is that that means

24   that if they're suing under C.1 or C.4, that this language is not

25   at issue either way.

1          MS. ELLIOTT:  Yes.  So I -- your Honor is one step

2     ahead of everybody.  That's where I was going next.

3          I confess, I don't completely follow -- I don't

4     completely follow the argument, but what I was able to discern

5     and note it is that I think Mr. Berghammer said that they can

6     still sue under C.1 and C.4, I think is what I have down.

7          THE COURT:  That's what I understood.  Yes.

8          MS. ELLIOTT:  Okay.  So if we look at C.1, it says,

9     except as provided in Sections C.3 and C.7, Wal-Mart agrees that

10    as of the effective date of this agreement, it will not at any

11    time manufacture, have manufactured on the -- on its behalf,

12    market, offer to sell, use, import, purchase, promote, or

13    distribute, whether directly or indirectly, any of the accused

14    products in the United States.

15         So when Yeti says they can still sue under C.1, I'm

16    figuring out -- trying to figure out what it is that they say

17    Wal-Mart has done subject to that provision.  Because Wal-Mart,

18    in fact, stopped selling Ozark Trail product pursuant to this

19    agreement.  And there's no allegation in the complaint that

20    aligns with C.1 language.

21         Now, to the extent that he's broadly talking about the

22    IP infringement claims in the complaint, those were foreclosed by

23    this settlement agreement and that was dismissed.  If he's

24    talking about sales after October 15, 2017, that's where I go

25    back to the omission we discussed earlier.  He doesn't point to

1  any Wal-Mart sales after October 15, 2017.  What he points to are

2  a couple of generic tumblers.  I think their example's 13 through

3  17 in the complaint, your Honor.  So a couple of the examples

4  don't identify who's the seller.  They don't have the date.  They

5  don't have when it was viewed.

6          Now, the couple that later submitted declarations after

7  the fact, not in the complaint, can't be considered on the motion

8  to dismiss, purport to identify, you know, 2018 dates that they

9  were looked at.  The problem still goes back to C.2, which is

10  unless you are pointing to a Wal-Mart product, we still have no

11  claim under C.1.  There's absolutely nothing cognizable,

12  articulated to, pointed to, identified that will put us in C.1.

13          So what we do have that we can see from the complaint

14  puts us back in C.2, and it puts us back into the Milo &

15  Gabby-Amazon case, and the Multi Time case, and the other ones

16  cited in our briefs.

17          With respect to C.4, this is the takedown of the social

18  media piece.

19          THE COURT:  But it also includes --

20          MS. ELLIOTT:  Yes.

21          THE COURT:  -- anything on walmart.com here explicitly.

22          MS. ELLIOTT:  I'm sorry, your Honor, I didn't catch

23  that.  One more time.

24          THE COURT:  I'm sorry.  It says agrees to take down

25  permanently any content that -- internet or social media content

1  of which Wal-Mart has any control.

2          MS. ELLIOTT:  Yes.

3          THE COURT:  That depicts the accused products, and it

4  says, including any applicable content and hyperlinks on any

5  website of Wal-Mart, including, in this instance, walmart.com.

6          MS. ELLIOTT:  Yes.

7          And I think the operative word in that provision, your

8  Honor, is "control" because what the parties define in C.2 is

9  what Wal-Mart does and does not have control over.  And so, what

10  C.4 is actually talking about is taking Ozark Trail product down,

11  which Wal-Mart did.  So if you were to look on there now, if you

12  were to look on there, you know, whenever they were perusing the

13  website, what you would not find, based on Wal-Mart's having

14  complied with this provision of the agreement, is the Ozark Trail

15  products that it took down.  They did have Gen 2, which are the

16  products that Yeti approved of --

17          THE COURT:  Was already approved.

18          MS. ELLIOTT:  -- on the website.  So that that control

19  should be read throughout the whole agreement.  I think it defies

20  logic to pull, divorce C.2 and the definition in C.2 from

21  everything else in this agreement.  Again, to state the obvious,

22  for the avoidance of doubt was to avoid exactly what we're doing

23  here today, your Honor.

24          We respectfully submit that this is the rare

25  exceptional case.  It's a pleasure to be in your courtroom, but

1  we shouldn't be here.  This is something that was filed to try to

2  get different terms on that agreement.  Wal-Mart understands that

3  Yeti wants to enforce its IP.  Yeti wants Wal-Mart to help it

4  enforce its IP.  That's not Wal-Mart's responsibility, not under

5  the law and certainly not under the agreement.

6           THE COURT:  Thank you.

7           Mr. Berghammer.

8           MR. BERGHAMMER:  Thank you, your Honor.

9           So there's some confusion about the agreement and I

10  want to make some things clear, your Honor.  So I'm going back to

11  D.4.  D.4 states --

12           THE COURT:  C.4 or D.4?

13           MR. BERGHAMMER:  Thank you, your Honor.

14           THE COURT:  C.4.  Okay.

15           MR. BERGHAMMER:  C.4 states that Wal-Mart agrees to

16  take down and permanently delete internet content over which

17  Wal-Mart has control that depicts any of the accused products,

18  capital A, capital P, including content or hyperlinks on any

19  website of Wal-Mart, including www.walmart.com.  So what are

20  accused products?

21           Up there, No. 2 -- before I do that, I'm taking in

22  confidentiality, counsel, is it all right if I disclose the

23  terms?  If I disclose the definitions?

24           MS. ELLIOTT:  Your Honor, maybe we'll just see where he

25  points to.

1          THE COURT:  Sure.

2          MS. ELLIOTT:  Thank you.

3          THE COURT:  Okay.

4          MS. ELLIOTT:  Thank you.

5          MR. BERGHAMMER:  So the Section 2 at the top of this

6    document, your Honor, states A-2, which is the agreement -- so

7    it's A-2, accused products means accused beverage holders and

8    accused tumblers as defined herein.  A-3 says accused tumblers

9    means the 20-ounce and 30-ounce tumblers depicted in Exhibit A-2.

10   And definition at the bottom of this, page A-1, accused beverage

11   holder means the can beverage holder product depicted in Exhibit

12   A-1.

13         So we're referring to the products in Exhibits A-1,

14   A-2.

15         Here, the agreement points out the accused beverage

16   holder in Exhibit A-1.  It says nothing about Ozark Trail.  The

17   accused beverage holder does not have any kind of Wal-Mart logo.

18   It's a beverage holder that looks like that.  A-2 is examples of

19   the accused tumblers.  This is a 20-ounce tumbler and a 30-ounce

20   tumbler.  Again, nowhere is there mention of Ozark Trail, as

21   counsel for Wal-Mart mentioned.  Nowhere is there any logo.

22         So the only way to read D.4 is, Wal-Mart is agreeing to

23   permanently remove C.4 -- sorry, your Honor, I did it again --

24   any internet content depicting accused products on any website of

25   Wal-Mart, including www.walmart.com.  These, your Honor, on

counsel table are the products that were advertised on
www.walmart.com. These have the exact same profile as the
accused products. Wal-Mart today, still, has not removed these
products from its website www.walmart.com.

Now, I don't think counsel for Wal-Mart is saying this,
but I would like to see if she is. Is counsel for Wal-Mart
saying that Wal-Mart does not have control of www.walmart.com?
That Wal-Mart is not able to take down content on
www.walmart.com? If she is saying that, that's exactly the
opposite as Wal-Mart was saying in the -- when the GAO report
came out saying that Wal-Mart was a counterfeiter. Wal-Mart at
that time was saying no, we're not a counterfeiter, we have a lot
of control. In fact, we're an invitation-only website. Don't
cast us like Alibaba. Don't cast us like eBay. We're very
different.

If Wal-Mart is -- I'd very much like to hear Wal-Mart
say today that they have no control over www.walmart.com. I
think it's wrong, but I'd like to hear if that's what they're
saying.

So that's a violation of D.4, your Honor -- C.4. C.1,
Wal-Mart asks what it did that violated C.1. Wal-Mart marketed,
offered to sell, promoted, distributed, both directly and
indirectly, accused products. There they have. We've got dozens
of them. You can't even tell they're counterfeits until you cut
them open. You can't tell they're counterfeits, except there's a

teeny typo: The C on China isn't capitalized. So they violate both D.4 and D.1. They've also violated Yeti's IP rights.

I want to talk about some other things, your Honor. So Wal-Mart has made a lot of comments that Yeti has been moving the ball, has been changing its argument, and that's flatly wrong. This is paragraph 33 of Yeti's complaint and this is a transition paragraph. Prior to paragraph 33, Yeti said, Yeti has all sorts of rights and these rights are awesome.

And then, starting in paragraph 33, Yeti says, Yeti and Wal-Mart entered into an agreement, and despite Wal-Mart's clear and express obligations under this agreement with regard to the accused products, Wal-Mart continues to unlawfully advertise, market, promote, offer to sell. And then, what does Yeti do? We went way out of our way and we include image after image. And here, you see it's the Wal-Mart website, image after image of products that are on Wal-Mart's website, walmart.com. And we looked recently, your Honor, they're still there.

So when Wal-Mart says it doesn't know what we're talking about, that just falls on deaf ears for us because here's what was from Yeti's complaint. And if Wal-Mart bothered to go to its website, here's an image on Wal-Mart's website from April 21 of 2018, and you see this product that's called a Yeti black stainless steel tumbler. Another product from Yeti's complaint and here it is on Wal-Mart's website.

So from Wal-Mart -- I'll just do another one. Here's

1  another image from Yeti's complaint.  I've got the pages screwed

2  up, your Honor.  Here's another image from Yeti's complaint.  And

3  here's the image on Yeti's -- on Wal-Mart's website on April 21.

4          So Wal-Mart's arguments that Yeti has been changing its

5  arguments are just flat wrong.  Yeti, all along, has said to

6  Wal-Mart, everything was going fine.  We signed this agreement

7  and you breached the agreement, and it's based on your breach of

8  the agreement that we're suing you.  And we're not only suing you

9  for breach of the agreement, we're suing you for intellectual

10 property infringements; and yet, you sell counterfeit products,

11 you sell infringing products, all those claims remain in this

12 case.

13         I also, your Honor, briefly want to talk about harm and

14 why a stay really harms Yeti.  Two reasons.  One, Wal-Mart

15 continues to sell and these products are grossly inferior.  The

16 comments on Wal-Mart's website regarding these products, lid

17 cracked, bottom cracked, doesn't keep ice, dripping, just over

18 and over again about how these are inferior products.  And the

19 people on Wal-Mart's websites that buy them think they're from

20 Yeti.  So this bad will is being attributed to Yeti.  On top of

21 that, evidence is being lost.

22         If we stay discovery, especially on the internet, we're

23 losing evidence, we might not be able to find people that did

24 postings, memories fade, e-mail addresses change.  So this is a

25 classic case where we can't stay discovery.

1          And in addition, your Honor, while Wal-Mart says Yeti

2    is changing its position, which Yeti is not, it's Wal-Mart that's

3    changed its position in its motion to dismiss.  So our whole

4    premise today is that the motion to stay is based on Wal-Mart's

5    motion to dismiss.  It claims res judicata.  All right.  That's

6    out of the case.  It claims that Yeti has not alleged sufficient

7    harm.  Well, we've got like 15 bullets of harm that we've alleged

8    in the case.  And then, they say, well, Yeti hasn't alleged

9    specifically what the violations are.

10          Paragraphs 33 through 48 do that, including numerous

11   illustrations.  So Wal-Mart has now changed its argument to say,

12   oh, well, actually, we're making this breach of contract

13   argument, which it didn't make with any significance in the

14   motion to dismiss.  It may have touched on it in passing, but it

15   barely made the argument.  And regarding that argument, which

16   you're hearing all orally, your Honor, it doesn't address C.1 and

17   C.4.  It doesn't address Yeti's intellectual property rights

18   outside breach of contract.

19          So I know I'm getting a little adamant, your Honor.

20   Thank you.

21          THE COURT:  All right.

22          Ms. Elliot, it's your motion, so you get to have the

23   last word.

24          MS. ELLIOTT:  Thank you, your Honor.

25          Your Honor always worry about casting aspersions and

speculating, but we heard Mr. Berghammer acknowledge some things.

He wants Wal-Mart to police IP for Yeti. That's pretty explicit. It was sprinkling in through their motion papers and discovery, but it's pretty much on the table now. It's not just Wal-Mart speculating. Yeti wants Wal-Mart to police the internet for their alleged IP rights, which, again, is not Wal-Mart's responsibility under the law and under the express terms of the agreement.

Everybody that Mr. Berghammer just pointed to, what he was saying was in the complaint and was examples in the papers are all third-party products. Wal-Mart's not manufacturing, Wal-Mart's not selling them. Wal-Mart is hosting the sale on its e-commerce platform, just like eBay and Amazon does. And I don't want to harp on that, your Honor, because I -- I suspect that our positions are clear whether -- who's right on it remains to be seen, but I think we want to be clear on that.

I think it's also pretty clear based on argument -- there was a footnote in a brief -- but it came out clear today, Yeti is looking for an avenue to go back to the terms of this agreement. He mentioned rescission as damages. I mean, your Honor, this is pretty now blatant attempts to go back and renegotiate the terms of this agreement. Impermissible. You can't use device of discovery with no actionable, cognizable claims to go then find some claims so that you get an agreement with terms that are better than the first. That's just, I think,

1   inappropriate and it's impermissible under the law.

2           It's interesting that Yeti has spent a lot of time in

3   its recent papers and discovery and comments to your Honor and

4   Judge Pitman about counterfeiting.  Yeti can't possibly say

5   counterfeiting started after March 2017.  This -- according to

6   this documents they cite, which are outside of the complaint and

7   not appropriate for this determination, but nonetheless, they

8   talk about counterfeiting all over the marketplace and that it's

9   been going on for quite some long time.

10          And why am I mentioning the timing of that is because a

11  good portion of our motion to dismiss is about the fact that

12  these were complaints that either were raised or could have been

13  raised in the first suit.  And under the black-letter case law of

14  res judicata, they're foreclosed; and they're also foreclosed

15  under the settlement agreement under Section F.1, your Honor.

16          And if I just may briefly put that on the screen.  It's

17  a covenant not to sue.  Oh, I'm sorry.

18          THE COURT:  Any objection to that?

19          MS. ELLIOTT:  I apologize.  Thank you.

20          THE COURT:  Any objection to us looking at that F.1

21  provision?

22          MR. BERGHAMMER:  No, your Honor.

23          THE COURT:  Okay.

24          MS. ELLIOTT:  In F.1, your Honor, for the record, it's

25  Yeti covenants not to sue Wal-Mart and Wal-Mart's

representatives, officers, directors, employees, successors,

agents, customers, assigns, and other transferees, but not

including entities that provided the accused tumblers to

Wal-Mart, from any and all demands, claims and causes of action

Yeti raised or could have raised in the lawsuit related to the

accused products sold by Wal-Mart.  Yeti's covenant not to sue

does not extend to the Sam's publication.

So, your Honor, here's another example like C.2 of the

parties effectively repeating what is the law.  We are now

hearing all kinds of ways to read and torture the language of

this agreement to somehow wrestle some claim together that would

allow discovery to proceed, and, your Honor, we respectfully

submit that's not the way this process should go.  That's not the

way litigation should be used.  And that's not how the court

resources and party resources should be used.

We regret that the information that was provided in

February did not get to Yeti in November.  Wal-Mart regrets that.

There's reasons for that, but there's also the reasons for that

are reflected in the language of this agreement.  Their language

that was inserted, reasonably track.  There's language talking

about reasonable efforts.  That language was entered into the

agreement by the parties because of the issues around designs

being so similar, the Gen 1 and Gen 2 being similar and the

difficulties in the marketplace of distinguishing them.

I don't want to get in too much detail about it.  It's

not -- we have to all work off of the complaint and this
agreement, and we think those are the things we should be focused
on for purposes of motion to dismiss and the motion for a
protective order.  And so, we do focus on that.  But I just want
the acknowledge we do regret not getting that information sooner,
but it's not a breach of this agreement.  Even if it was a breach
of the agreement, Yeti doesn't disclose any way it was harmed by
that three-month differential time.

Your Honor, we don't think there is any claim to pursue
here.  And we don't think that Yeti should get wide-ranging
discovery on claims that are clearly foreclosed under the law and
under their agreement.  And should there be any remaining aspect
of discovery for some breach of this notice provision, it
certainly should cabin any discovery that should be ordered to
proceed, your Honor.

We thank you for your time and for listening.

THE COURT:  Thank you.

Probably won't surprise you, I want to digest all of
this and look at this more carefully, and then, we will get
something out relatively soon on the issue of the protective
order and whether discovery can go forward.

Thank you for the elucidation; it helped a lot.  But I
always think that I get something out of these hearings when
there's something like this that helps me clarify things.  So
appreciate it.  We'll stand in recess.

1          MR. BERGHAMMER:  Thank you, your Honor.

2          MS. ELLIOTT:  Thank you, your Honor.

3          (Proceedings conclude at 3:35 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                           REPORTER'S CERTIFICATE

5

6     I, LILY I. REZNIK, DO HEREBY CERTIFY THAT THE FOREGOING WAS

7   TRANSCRIBED FROM AN ELECTRONIC RECORDING MADE AT THE TIME OF THE

8   AFORESAID PROCEEDINGS AND IS A CORRECT TRANSCRIPT, TO THE BEST OF

9   MY ABILITY, MADE FROM THE PROCEEDINGS IN THE ABOVE-ENTITLED

10  MATTER, AND THAT THE TRANSCRIPT FEES AND FORMAT COMPLY WITH THOSE

11  PRESCRIBED BY THE COURT AND JUDICIAL CONFERENCE OF THE UNITED

12  STATES.

13

14  _/s/Lily I. Reznik_                    _May 14, 2018_

15  LILY I. REZNIK                         DATE

16

17

18

19

20

21

22

23

24

25